## FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Maryland Corporation, Plaintiff,

v.

## USAFORM HAIL POOL, INC., a Florida Corporation, et al., Defendants.

### No. 63–186–Civ–J–M.

United States District Court,
M. D. Florida,
Jacksonville Division.

Jan. 30, 1979.

As Amended Feb. 1, 1979.

---

George Stelljes, Jr., Marks, Gray, Conroy & Gibbs, Jacksonville, Fla., for plaintiff.

Thomas T. Cobb, Cobb, Cole, McCoy, Abraham, Bell, Bond, Monaco & Kaney, Daytona Beach, Fla., for defendants.

## OPINION

MELTON, District Judge.

This diversity case is before the court upon remand from the Fifth Circuit Court of Appeals, which reversed a previous judgment of this court in *Fidelity and Deposit Company of Maryland v. USAFORM Hail Pool, Inc.*, 523 F.2d 744 (5th Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976) ("*USAFORM II*"). The plaintiff, Fidelity and Deposit Company of Maryland (hereinafter "F & D"), seeks a declaratory judgment to determine its liability on a fidelity bond it issued to certain named corporations (hereinafter collectively referred to as "the claimants"); these corporations, in turn, counterclaim to recover certain losses allegedly covered by the bond.

To date, this case has generated three appeals. In the first, the Court of Appeals affirmed this court's summary judgment against certain parties, not named as insureds under the bond, who had sought to intervene in these proceedings on a third party beneficiary theory. *American Empire Insurance Co. of South Dakota v. Fidelity and Deposit Co. of Maryland*, 408 F.2d 72 (5th Cir.), *cert. denied*, 396 U.S. 818, 90 S.Ct. 55, 24 L.Ed.2d 69 (1969). The second appeal followed a bench trial on the merits of the case between F & D and the defendant corporations, which trial had resulted in a judgment for the insureds on their counterclaims. In the second appeal, the Fifth Circuit determined that this court had utilized an incorrect legal standard to decide the amount of F & D's liability on the bond, and accordingly vacated the judgment and remanded the case for adjudication under the proper standard. *Fidelity and Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.*, 463 F.2d 4 (5th Cir. 1972) ("*USAFORM I*"). Finally, in the third appeal (*USAFORM II, supra*), the Fifth Circuit ruled that in the proceedings on remand from *USAFORM I*, this court had misconstrued that opinion; the court then went on to analyze in some detail the issues involved in this case and the facts established by the record herein. Once again, of course, the judgment was vacated and the case remanded for yet another trial in this court.

Following the *USAFORM II* remand, this court offered the parties an opportunity to submit any additional evidence that would be relevant in light of the *USAFORM II*

decision. Understandably enough, both sides agreed that substantially all the relevant evidence was already a part of the record in these proceedings; F & D introduced only a few documentary exhibits, and the claimants submitted no new evidence at all on the merits of the case. (The claimants did introduce evidence relevant to their prayer for an award of attorneys' fees, a claim that the court will consider. *infra.*) The court has now heard the final arguments of the respective parties, and the case is presently ripe for adjudication on the merits.

The facts underlying this case have been exhaustively recounted in the prior opinions of the Court of Appeals and of this court, and it is unnecessary to reiterate those facts in great detail here. Essentially, the case arises out of numerous transfers of funds among several interlocking corporations under the primary control of one man, F. Wylly Clarke. Three of these corporations comprise the group of claimants before the court today: USAFORM Hail Pool, Inc. ("USAFORM"), a Florida corporation; U. S. & Foreign Management, Ltd. ("Limited"), a New York corporation; and USA-FORM Pan American, Ltd. ("Pan-Am"), a Delaware corporation. These three claimants were part of a larger group of interrelated corporations under Clarke's control; for a graphic depiction of the relevant corporations and their mutual relationships, see the chart reproduced in the margin of the Fifth Circuit's *USAFORM II* opinion, 523 F.2d at 752 n.1.

The corporate complex controlled by Clarke was organized to provide farmers with crop insurance against losses sustained as a result of hail storms. Basically, Clarke offered participation in a hail insurance pool to various insurance companies, who themselves insured hail storm losses to farmers; participating insurance companies accepted the risks and apportioned profits on a pro-rata basis. USAFORM itself operated as a manager of the hail insurance pool, collecting premiums from participating companies and managing that fund on the companies' behalf. Since USAFORM sold no hail insurance on its own, its net income accrued only from commissions it charged for managing the pool. Similarly, both Pan-Am and Limited sold no insurance; each company acted only as a reinsurance broker among other insurance companies who wished either to "cede" portions of their liability under extant insurance policies or to insure other carriers against liability on those policies. In this go-between role, both Pan-Am and Limited would receive premium monies from the ceding company for eventual disbursement to the insuring company. What USAFORM, Limited, and Pan-Am had in common, of course, was that each held the premium monies in a fiduciary capacity for the benefit of the insurance companies that each dealt with.

The bond in question here was purchased to insure the claimants (and several other members of Clarke's corporate complex) against losses sustained as a result of the fraudulent or dishonest acts of the claimants' employees. The specified coverage limits were $100,000 as to each employee involved in the fraud or dishonesty causing the losses, and an additional $400,000 in excess coverage. Under the circumstances of this case, the coverage available to claimants totals $800,000—$100,000 as to each of the four employees involved in the allegedly unlawful transactions, and $400,000 in excess coverage.[1] There is no dis-

---

1. In the instant proceedings, F & D has suggested that its total exposure is only $500,000, arguing that only one employee's acts—*i. e.,* Clarke's—proximately caused the claimants' losses, if any. This position is untenable. Judge Scott's 1970 opinion, published at 318 F.Supp. 1301, concluded that $800,000 in coverage was available to the claimants. *Id.* at 1312. When F & D appealed the 1970 judgment, it contended (*inter alia*) that that conclusion was erroneous, and that its maximum exposure was only $500,000. Brief for appellant, *Fidelity and Deposit Co. of Maryland v: USAFORM Hail Pool, Inc.,* 463 F.2d 4 (5th Cir. 1972), at 51–54. Although F & D's appeal succeeded on other grounds, the Fifth Circuit did not specifically address F & D's contention that the coverage limits were erroneously decided in the district court. Instead, after concluding that this court had applied the wrong standard in construing the bond, the court of appeals stated only that "[w]e have carefully reviewed all other grounds

pute over the fact that the bond was in effect during the time period when the acts allegedly covered by the bond took place.

■ In the rather lengthy route to final adjudication of this controversy, substantially all of the issues initially in dispute have been decided somewhere along the way. Thus, it has been determined that although Clarke was the dominant figure in the insured corporations and the prime mover behind the transactions that underlie the insureds' alleged losses, he was an "employee" within the meaning of the bond, so that his actions could lead to F & D's liability thereon.[2] Similarly, it has been established that each insured corporation must be viewed as a separate entity despite the tightly woven fabric of the overall complex of corporations; thus, a transfer by one insured corporation should be scrutinized as an individual transaction, with its legitimacy evaluated on an individual basis, even though the transferee might have been another entity within the overall complex. As Judge Wisdom noted in *USAFORM II*, *USAFORM I* firmly established that "each corporate tub must stand on its own bottom." 523 F.2d at 756. The key question in each instance is not whether the corporate complex as a whole sustained a loss covered by the bond; rather, it is whether, in disbursing funds at the dishonest or fraudulent direction of its employees, the individual insured corporation *itself* sustained a loss that is covered by the bond.

This question, in fact, is the only one left open at this stage of the proceedings. As to each transaction that the claimants rely upon to establish a covered loss, this court's task is to determine whether the transaction did in fact result in a "loss" within the terms of the bond. In this connection, it is important to note that the dishonest and fraudulent environment cloaking the transfers in question here has already been established for the present purposes. As the Court of Appeals stated in *USAFORM II*, "the findings of fraud and dishonesty were clear and pervasive in the district court's [1970] opinion, and they were affirmed in our [*USAFORM I*] opinion." *Id.* at 757. The only issue before this court today, then, is one of "loss" under the bond; the touchstone of that inquiry, as the court stated in *USAFORM II*, is "whether the wrongfully appropriated monies went to pay legitimate corporate obligations (in which case there would be no 'loss') or whether they were made for any other purpose (in which case there would be a 'loss')." *Id.*

■ In *USAFORM II*, moreover, the court went to considerable lengths to clarify the standards to be used in evaluating whether particular transactions were in fact made to fulfill legitimate corporate obligations. In this connection, it is important to remember that in order to serve a legitimate corporate purpose, any disbursement would have to comply in all respects with the applicable state law governing corporate transactions.[3] Thus, even if a transfer of funds actually fulfilled a preexisting corporate duty, or actually benefitted the transferor corporation in some manner, it would still fulfill a legitimate corporate purpose only if it complied with the applicable state statutes or common law. This court has already found that the named insureds, including the claimants, were all insolvent at the time of each transfer in question. That finding was implicitly affirmed in *USAFORM I*. *See USAFORM*

---

2. *See Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.*, 318 F.Supp. 1301, asserted by [F & D] and affirm the district court in all other respects." *USAFORM I*, 463 F.2d at 7. Thus, it is now the law of this case that F & D's maximum exposure amounts to $800,000 *rather than the suggested $500,000*, and F & D cannot reopen that issue at this stage of the proceedings. *E. g., Schwartz v. NMS Industries, Inc.*, 575 F.2d 553 (5th Cir. 1978).

1308–9 (M.D.Fla.1970). This proposition was impliedly affirmed in *USAFORM I* in the manner described in note 1, *supra. See* Brief for appellant, *USAFORM I*, 463 F.2d 4 (5th Cir. 1972), at 36–40.

3. As previously stated, USAFORM was a Florida corporation; Limited was a New York corporation; and Pan-Am was a Delaware corporation.

*II,* 523 F.2d at 759. Since the applicable state law, discussed *infra,* severely limits the types of transactions that can be accomplished legitimately by an insolvent corporation, the insolvent condition of the claimants in this case becomes especially important.

The court should note one other principle established by *USAFORM II.* Observing Clarke's dominating influence over the insured corporations and the apparent conflicts between Clarke's personal interests and the interests of those corporations, the Fifth Circuit declared that, under the circumstances of this case, F & D should bear the burden of establishing the legitimacy of Clarke-directed disbursements by the insured corporations. Relying on the common-law cases of *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and *Geddes v. Anaconda Copper Mining Co.,* 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425 (1920), the court noted that fraudulent invasions of trust funds had already been proven in the district court; since F & D was (and is) asserting that the fraudulently-taken funds were nevertheless applied to serve the legitimate purposes of the disbursing corporations, the Fifth Circuit felt that it should be F & D's burden to establish that legitimacy. *E. g.,* 523 F.2d at 761, 762.

With these principles in mind, then, the court now turns to an individual analysis of the claims asserted here by the three insured corporations. The court will consider first the claims of USAFORM; those of Limited and Pan-Am will follow *seriatim.*

## CLAIMS ASSERTED BY USAFORM

1. *Payment of 1961 pool debts of U.S. & Foreign Management, Inc., in the amount of $170,467.18.*

■ This claim originates in the circumstances of USAFORM's incorporation. During the 1961 growing season, USA-

FORM did not exist; the hail pool funds were managed by an entity named U. S. & Foreign Management, Inc. (hereinafter "Inc."). At the time, Inc. functioned as both a hail pool manager and a reinsurance broker.

Ostensibly to separate Inc.'s pool management and reinsurance functions into separate entities, Clarke promoted and secured the incorporation, under Florida law, of USAFORM. At USAFORM's first board meeting (chaired by Clarke), on November 20, 1961, a resolution was adopted calling for USAFORM to purchase most of Inc.'s assets; the consideration for this transfer was to be USAFORM's assumption of all of Inc.'s liabilities. The board's resolution was carried out under a contract between Inc. and USAFORM dated November 30, 1961.

At the time of this transaction between Inc. and USAFORM, Inc.'s only assets of any substance consisted of a debt of $115,000 owed the corporation by Clarke, and other assets totalling $110,000.[4] Inc.'s liabilities amounted to over $275,000 owed to creditors of the 1961 hail pool. Although Inc. transferred all its liabilities—which had grown to $295,000 by the time the transaction was consummated—to USAFORM, it retained as an asset Clarke's $115,000 debt to it, and thereafter became a functionless, dormant entity. The net effect of all this was to wash out Clarke's personal debt of $115,000 when USAFORM assumed Inc.'s liabilities and accordingly paid Inc.'s creditors.

It is USAFORM's various disbursements to what were formerly Inc.'s creditors that underlie the instant claim. The legitimacy of these disbursements does not depend on USAFORM's *method* of paying Inc.'s creditors; in fact, there was apparently nothing fraudulent or dishonest about those payments in isolation. Rather, this court must determine whether it was legitimate for

4. The court should note that USAFORM's purchase of Inc.'s assets also included an item of some $780,000 in "good will", which USAFORM then carried as an asset on its own books. This court's 1970 opinion termed this an "illusory asset", 318 F.Supp. at 1305, a rath-

er mild characterization in light of Inc.'s substantial debts and insufficient means of paying them. Any analysis of the USAFORM/Inc. transaction should be undertaken without regard to the chimerical good will figure.

USAFORM to assume Inc.'s debts *in the first place. USAFORM II*, 523 F.2d at 761. After reviewing the record, this court finds that F & D has not carried its burden of proving that USAFORM's assumption of Inc.'s debts fulfilled a legitimate corporate purpose of USAFORM.

USAFORM's assumption of Inc.'s pool debts in effect meant that USAFORM was insolvent from its inception. Discounting the illusory asset of good will,[5] the balance sheet of USAFORM immediately after the Inc. deal showed roughly $110,000 in assets and over $285,000 in liabilities. Thus, the consideration USAFORM received in exchange for assuming Inc.'s debts was inadequate by over $175,000. On this record, there is no conceivably legitimate purpose for USAFORM to enter into this transaction. In fact, the only purpose imaginable is the effective retirement of Clarke's personal debt of $115,000, and that purpose of course falls far short of the legitimacy that F & D must prove to avoid liability. For that reason, USAFORM will prevail on its claim for the monies it disbursed to pay Inc.'s pool debts; the disbursements proven on this record total $170,467.18.

### 2. Advance of $14,000 to Halifax Insurance Agency.

█ Some months after its formation, and while it was insolvent under any conceivable standard, USAFORM transferred $14,000 to the Halifax Insurance Agency—of which Clarke was a 50% owner—and entered the transfer on its books as an "advance". The transfer was accomplished by means of a check dated June 11, 1962, and drawn on USAFORM's general account. Halifax was a small, local insurance company whose only connection with USAFORM—aside from having produced "some business" for USAFORM—was

Clarke's presence as sole owner of USAFORM and half-owner of Halifax. At the time it received these funds, Halifax was, like USAFORM, insolvent.

F & D has failed to persuade this court that there was a legitimate corporate purpose behind USAFORM's apparently consideration-free transfer of this money to Halifax. USAFORM's by-laws evidence no legitimate obligation that USAFORM might have discharged by this transfer; moreover, F & D has not shown the court any contractual duty that USAFORM might have fulfilled when it advanced the funds in question.[6] In sum, F & D has failed to rebut an inference obvious from this record: that USAFORM advanced the $14,000 to Halifax at Clarke's behest not to fulfill any legitimate corporate purpose on USAFORM's part, but merely to benefit Halifax—and thus Clarke—by keeping Halifax afloat. Insofar as this record indicates, that was a completely gratuitous act by USAFORM; since the $14,000 disbursement fulfilled no legitimate corporate purpose, USAFORM sustained a loss thereby within the terms of this bond, and USAFORM will prevail on this claim.

### 3. Advances to Limited totalling $63,-331.10.

█ During the 1962 calendar year, USAFORM made several "advances" of monies to Limited. Limited's balance sheet for December 31, 1962, indicates that these advances totalled $63,331.10. That these advances involved a fraudulent and dishonest invasion of trust funds has already been established—in fact, USAFORM effected the transaction in question by simply assigning to Limited premium monies forwarded to USAFORM by participating insurance companies and, of course, earmarked for deposit in the hail pool.[7] Again,

---

5. See note 4, *supra.*

6. For example, there is no evidence of any commissions owed Halifax by USAFORM in exchange for Halifax's securing "some business" for USAFORM.

7. Specifically, the premiums were initially sent to USAFORM by two participating insurance companies: White Insurance, Inc., and Christensen General Agency. Substantially all of these premium monies were then assigned to a London company, Arbon, Langrish & Co., Ltd., to secure an indebtedness owed Arbon, Langrish by *Limited.* The evidence shows that at the time Arbon, Langrish was exerting some pressure on Clarke to settle Limited's debt to the company.

since the fraud surrounding these transfers has already been established, F & D must prove that the advances nevertheless went to pay a legitimate obligation of USA-FORM.

F & D points only to the fact that "the overall corporate structure needed that movement of funds" in attempting to demonstrate that there was a legitimate purpose behind the advances. Absent some specific legal duty for USAFORM *itself* to keep the complex going—or at least to keep Limited afloat—this is no excuse. Once again, there is nothing in the record to indicate that the Limited advances were anything more than gratuitous outlays of cash insofar as USAFORM was concerned; since F & D has failed to demonstrate a specific corporate obligation that would legitimatize these transactions, USAFORM will prevail on this claim.

### 4. Payment of debentures to Clarke in the amount of $10,000.

When USAFORM was organized in 1961, it issued debentures with a face value of $100,000. These were sold to Clarke at a discount for $94,200, an amount that Clarke borrowed by pledging the debentures as security. On July 10, 1962, USAFORM issued a check to Clarke for $10,000 in payment of one debenture, which had come due according to its terms.

If USAFORM had been solvent at the time of this transaction, the $10,000 payment indubitably would have fulfilled a legitimate corporate purpose. As already noted, however, USAFORM was in fact insolvent when it redeemed the debenture. Fla.Stat. § 608.55 (1973) (now repealed) prohibited (and voided) corporate payments to officers or directors to satisfy debts if the corporation itself was insolvent or imminently insolvent at the time of payment. The court finds that USAFORM's redemption of the $10,000 Clarke debenture violated former Fla.Stat. § 608.55, and accordingly that it fulfilled no legitimate corporate

purpose for USAFORM to disburse those funds to Clarke. USAFORM will prevail on this claim in the amount of $10,000.

### 5. Two payments to Clarke amounting to $2,470.

This claim involves two checks issued by USAFORM to Clarke personally: one dated June 20, 1962, in the amount of $1,220.00; the other dated December 28, 1962, in the amount of $1,250.00. After issuing these checks, USAFORM carried the disbursements on its books as "travel and entertainment expense." As a general proposition, travel and entertainment expenditures made in good faith to benefit a particular corporation unquestionably meet a legitimate corporate purpose. By the same token, of course, if monies advanced to a shareholder for travel and entertainment on the corporation's behalf are not in fact applied to that purpose, then the cash advance amounts to, at best, an unsecured loan and, at worst, an outright gift to the shareholder.

Under *USAFORM II*, this court's mandate is to determine whether the $2,470 advanced to Clarke by USAFORM in fact was spent on efforts to benefit *that company*. The court would note that USAFORM's records indicate no specific accounting by Clarke, through expense voucher or otherwise, for the manner in which the $2,470 was spent.

Due to the close relationship of the business pursuits of the various companies in Clarke's corporate complex, any given business trip could be attributed almost interchangeably to any of the companies, absent specific facts regarding the purpose of the trip or expense. But given the environment of fraud that permeated the diversion of the funds from the trust accounts initially, the Fifth Circuit has imposed upon F & D the burden of proof to demonstrate that these particular travel and entertainment funds were spent in pursuit of legitimate

business interests of USAFORM, rather than on behalf of some other corporation in the Clarke complex. The proof before the court is wholly insufficient for that purpose, and under the terms of the mandate under which this court now operates, the claimants must prevail on this claim.

## CLAIMS ASSERTED BY LIMITED

1. *Limited's advances to Pan-Am in the amount of $237,361.44.*

■ Like several other of the claims asserted in this case, this item represents sums of money that were simply advanced to one member of the corporate complex by another. At the time of the advances in question, the transferee (Pan-Am) was a wholly-owned subsidiary of the transferor (Limited). Both corporations were in the reinsurance business; the difference between the two was that Pan-Am's sphere of operations was in South America.

As noted in *USAFORM II*, the evidence of record discloses that in the three-year period from 1960 through 1962, Limited drew checks on its premium account to the order of Pan-Am. The total amount advanced during the period in question was $237,361.44. Unquestionably, Pan-Am had no legal claim to these funds. The sole purpose behind the transfers appears to have been to keep Pan-Am afloat, and as subsequent events have shown, that was a lost cause.

To evaluate the legitimacy of Limited's efforts in Pan-Am's behalf, it is important to note the financial condition of the two corporations. The court has previously noted that both were insolvent, but as between the two, Pan-Am was in far worse shape than Limited. At the time of its acquisition by Limited, Pan-Am had virtually no assets and liabilities of approximately one million dollars. Before the advances were made, it owed no money to Limited at all. When

Limited advanced cash to Pan-Am, Limited would carry that advance on its books as an "account receivable", in the assets column [8], so that on paper there was no loss to Limited at all. In fact, however, Pan-Am's woeful financial condition made Limited's paper asset of its accounts receivable from Pan-Am virtually worthless. And, of course, Limited itself was insolvent at the time of its advances to Pan-Am.

The court finds that F & D has failed to demonstrate that Limited's advances to Pan-Am fulfilled a legitimate corporate purpose of Limited. At best, these advances can be viewed as interest-free loans made by a parent corporation to its subsidiary at a time when the parent itself was in no position to disburse its assets for any purpose other than to meet its *own* debts. Pan-Am's debts were its own, not Limited's [9], and Limited of course had no legal obligation to help Pan-Am pay its creditors. Since F & D has failed to assert any theory that might legitimatize Limited's advances to Pan-Am, the claimant Limited will prevail on this claim.

2. *Account receivable from Clarke in the amount of $33,163.52.*

■ As of December 31, 1962, Limited's balance sheet disclosed that stockholder Clarke owed the corporation $33,163.52, an amount that Limited carried on its books as an account receivable. The testimony of record establishes that this figure represents "advances" made to Clarke over a period of time, and Clarke himself has testified that he used the money to pay income taxes.

F & D has failed to establish any legitimate corporate purpose behind these loans, if indeed that is what they were, to Clarke. In light of Limited's insolvent condition, that would be a difficult task. Under its articles of incorporation and its by-laws, of

---

**8.** These advances were made from trust funds, so that for each item in the assets column representing premium monies on hand, there would be a corresponding item in the liabilities column representing premium monies due to third parties.

**9.** *See, e. g., Pagel, Horton & Co., Inc. v. Harmon Paper Co.,* 236 App.Div. 47, 258 N.Y.S. 168 (1932).

course, Limited had no obligation to see that Clarke's income taxes were paid. To the extent that the monies advanced may be viewed as a distribution of assets to a shareholder, it was an illegal distribution given Limited's insolvency. 58 McKinney's Consolidated Laws of New York, Stock Corporation Law, § 58.[10] To the extent that the monies advanced may be viewed as loans to a shareholder—probably a more apt characterization since Limited carried the advances on its books as an account receivable—the circumstances surrounding the loans placed them in violation of New York law as well. *See id.* § 59. In sum, F & D has shown no legitimate corporate purpose behind Limited's advances to Clarke, and Limited will prevail on this claim.

3. *Loan receivable on Limited's books in the amount of $10,145.90.*

In addition to the Clarke loan discussed as item (2) *supra,* Limited's balance sheet as of December 31, 1962, disclosed another entry of $10,145.90 as a "loan receivable" from H. A. Stebler. Stebler was an employee (and one-time stockholder) of Limited, and under the previous findings of this court, he was one of the parties to the fraud and dishonesty underlying this case.

Once again, F & D has failed to show that the loan in question met a legitimate obligation of Limited. The record is unclear as to the details of this loan—and given F & D's burden of proof on the matter, this fact inures to F & D's detriment—but that makes no difference in connection with this claim. If the loan was made while Stebler was a stockholder in Limited, it was legally indistinguishable from the illegitimate Clarke loan discussed in item (2), *supra.* And even if Stebler was only an employee, and not a stockholder, at the time of this transaction, F & D has failed to prove how Limited, incorporated as a reinsurance broker, could have had a legitimate corporate obligation to loan this sum to an employee free of interest. Limited will prevail on this claim.

10. The New York Stock Corporation Law governed the legitimacy of these transactions at the time of their occurrence. That law has

4. *Limited's advance to USAFORM International, Ltd., in the amount of $1,133.84.*

This claim arises out a check drawn by Limited on its premium account to the order of USAFORM International, Ltd. ("International"), in the amount of $1,133.84. International was a wholly-owned subsidiary of Pan-Am, and it was for the most part a dormant corporation. The testimony of H. A. Stebler was that in the entirety of International's existence it earned only a few hundred dollars.

Stebler further testified that Limited transferred funds to International to help that corporation pay its overhead expenses. F & D has failed to suggest any reason whatsoever, legal or otherwise, for Limited itself to have felt a corporate obligation to pay International's overhead. Insofar as F & D might argue that these were further efforts by Limited in aid of its subsidiary, Pan-Am, that "family benefit" theory of legitimate corporate purpose has already been rejected by the Fifth Circuit in *USA-FORM II.* Once again, this item represents at best an unsecured and interest-free loan by one insolvent corporation to another unsupported by any legitimate corporate purpose. Limited will prevail on this claim.

## CLAIMS ASSERTED BY PAN–AM

1. *Transfers to Clarke and Stebler in the amount of $11,600.*

During the year 1962, Pan-Am drew a total of twenty-one checks on its premium account to the order of Clarke and Stebler in the aggregate amount of $11,600. Both Clarke and Stebler were nominally Pan-Am employees at the time. F & D has failed to demonstrate the purpose to which these funds were applied or the nature of any Pan-Am obligation to Clarke and Stebler that prompted those payments in the first place. The suggestion that these were mere salary payments is untenable. The

now been superseded by the Business Corporation Law. *See* 1966 N.Y.Laws, c. 664, § 16.

payments were of irregular periodical sequence and were for even amounts of money ranging from $250 to $700. There is no evidence that Pan-Am paid a salary to either man, and in fact Clarke has testified, in deposition, that USAFORM paid all of his salary. Since F & D has failed to prove any legitimate obligation of Pan-Am that was met by disbursing these funds, Pan-Am will prevail on this claim.

### 2. *Advances to International in the amount of $16,800.*

This item involves a series of eleven checks, drawn on Pan-Am's premium account and payable to International, in the aggregate amount of $16,800. The only available evidence indicates that the money was used to pay International's overhead expenses in Zurich, Switzerland. Again, F & D has advanced no theory upon which the court could find a legitimate reason for Pan-Am to pay International's overhead. International's debts were its own, not Pan-Am's. These advances are legally identical to those from Limited to Pan-Am, see Limited's first claim *supra,* and the record is equally devoid of proof of any legitimate corporate reason for them. Pan-Am will prevail on this claim.

### OTHER MATTERS

### 1. *F & D's set-off theory.*

During the final arguments of counsel before the undersigned, F & D advanced a theory that had not, insofar as the record indicates, previously appeared in these proceedings. Essentially, F & D argued that to validate each of the eleven claims would sanction the unjust enrichment of these claimants by allowing overlapping recovery for the disbursement of what was effectively the same money funnelled through two or more members of the corporate complex. The court has rejected this approach. First, F & D has failed to show, and the court is unable to find from the record, that as a factual matter the same money *is* involved in two or more of these claims. (Notwithstanding that problem, of course, *all* these claimants were themselves insured against loss under F & D's bond.) But more significantly, perhaps, F & D has attempted to raise what amounts to a set-off defense, an affirmative defense under Florida law. The time to raise such a defense, if indeed it were available, was when F & D filed its reply to the claimants' counterclaim on January 25, 1966. The court has examined F & D's reply, and no such defense appears. It is too late, by thirteen years, for F & D to raise this defense now.

### 2. *Attorneys' fees.*

The court substantially resolved this issue in its order of August 18, 1978, wherein the court noted that under Florida law the claimants would be entitled to an award of attorneys' fees in this case in the event (1) that they prevailed on the merits, and (2) that they had not in some fashion waived their claim to attorneys' fees in this case. The first condition has now been resolved in the claimants' favor. As to the second, the court finds that, for the reasons set forth *infra,* there has been no effective waiver of the claimants' right to claim attorneys' fees in this case.

The claimants pled their right to recover attorneys' fees in their Amended Answer and Counterclaim filed on October 25, 1965, the operative pleading for present purposes. During the proceedings leading up to the first trial of this cause, in fact, the parties stipulated that attorneys' fees were recoverable under the relevant statute, Fla.Stat. § 627.428(1) (1977). After this court had heard the case and determined that judgment should be entered for the claimants, the parties submitted proposed opinions to the court; at that time, F & D formally objected to an award of attorneys' fees and tendered three Florida appellate decisions that indicated that Fla.Stat. § 627.428(1) did not apply to this case.[11] Upon reviewing

11. These three cases—*Phoenix Indemnity Co. v. Union Finance Co.,* 54 So.2d 188 (Fla.1951); *Main v. Benjamin Foster Co.,* 141 Fla. 91, 192 So. 602 (1939); and *United Bonding Ins. Co. v.*

those cases, the claimants conceded—erroneously, as it happens—that F & D was correct, and that attorneys' fees were not recoverable in this case. Thus, this court's 1970 opinion on the merits of this case, reported at 318 F.Supp. 1301, did not address the attorneys' fees issue at all. When F & D appealed the 1970 judgment, of course, the attorneys' fees issue was not raised. And the issue was similarly absent from the second appeal on the merits, since F & D had prevailed on remand and the claimants were the appealing party. Thus, neither *USAFORM I* nor *USAFORM II* dealt with the attorneys' fees issue in any fashion.

From F & D's argument on the attorneys' fees issue, this court can isolate only two distinct contentions on this point.[12] The first is that the claimants in effect stipulated to the legal proposition that attorneys' fees were unavailable in this case under Fla.Stat. § 627.428(1), and that that stipulation is presently binding on this court. The second contention is that due to the law of the case doctrine, the claimants may not litigate the attorneys' fees issue at this stage of the proceedings. In the court's view, neither of these arguments is persuasive.

As to F & D's first contention, it is sufficient to note that this court is not bound by an erroneous stipulation of law, especially where that stipulation would result in a "manifest injustice." *Equitable Life Assurance Society of the United States v. MacGill*, 551 F.2d 978 (5th Cir. 1977). Here, it is clear that to bind the claimants to the position that attorneys' fees are not recoverable in this case—which was an entirely reasonable and even laudable position at the time it was taken—would work a manifest injustice on the claimants. This case has been in active litigation for fifteen years, and the evidence before this court indicates that the time demands on the claimants' attorneys have been enormous. Although the claimants' recovery will be substantial, that sum has been legally due since 1963. Even augmented by the legal interest rate, this court's judgment will be unlikely to compensate the claimants fully in terms of 1963 dollars; in the interests of justice, it should not be further diminished by the excise of attorneys' fees. Thus, to deny an award of attorneys' fees would surely work a manifest injustice on the claimants and, in all likelihood, on their attorneys as well.

As to the contention that the law of the case doctrine precludes an award of attorneys' fees here, the court would point out that the attorneys' fees issue has never been addressed by the court of appeals. The law of the case doctrine applies only to those issues "expressly or impliedly disposed of on the [prior] appeal." *Gulf Coast Building and Supply Co., Inc. v. International Brotherhood of Electrical Workers, Local No. 480*, 460 F.2d 105, 108 (5th Cir. 1972). Unlike traditional res judicata, it does *not* reach "all questions which were present in a case and which might have been decided but were not." *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 663 (5th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). Although the issue might have been raised in F & D's *USAFORM I* appeal, it was not; that F & D did not raise it because the claimants had abandoned the issue at that time does not appreciably strengthen F & D's position, since the operative question is still whether the court of appeals in fact disposed of the issue.[13] And

---

*International Bank of Miami*, 221 So.2d 20 (Fla.3d Dist.Ct.App.1969)—are discussed in this court's opinion of August 18, 1978.

12. In its order of August 18, 1978, the court left open the possibility that F & D could demonstrate a waiver of attorneys' fees by the claimants based on facts not already appearing of record in this case. F & D has proffered no new evidence in this connection, and the court

is of course bound to treat the issue on the basis of the record before it.

13. Had the actual judgment of this court been affirmed in *USAFORM I* and the case remanded for the determination of collateral matters, the attorneys' fees issue would be more problematic. Under Fla.Stat. § 627.428(1) (1977), attorneys' fees recoverable by an insured in effect become an item of damages and, if award-

the issue was never raised in *USAFORM II* because this court's take-nothing judgment against the claimants of course contained no provision for attorneys' fees on the claimants' behalf. In sum, this court concludes that the law of the case doctrine does not preclude an award of attorneys' fees in this case.

Having considered and rejected F & D's arguments against an award of attorneys' fees in this case, this court holds that Fla.Stat. § 627.428 mandates the inclusion in the judgment of a reasonable sum as compensation for the claimants' attorneys' fees incurred in the course of this litigation. The factual basis for the attorneys' fees shall include all time spent in litigation before this court. Moreover, since attorneys' fees incurred in the course of a successful appeal are recoverable where the insured ultimately prevails, e. g., *Hart v. Bankers Fire & Casualty Insurance Co.*, 320 So.2d 485 (Fla.4th Dist.Ct.App.1975), the factual basis for the attorneys' fees to be awarded in this case shall include the time spent in the claimants' successful appeal in *USAFORM II.*

At the outset of proceedings before this court on remand, counsel for F & D proposed that in lieu of affidavits or testimony before the court by members of the bar as to the amount of fees to be awarded, the question should be submitted to a panel of three highly regarded members of the Jacksonville Bar who would, after careful study, report their findings to the court for final determination. Counsel for the claimants agreed to this proposal. The parties further stipulated that the panel members should be compensated for their efforts because of the complexity and volume of the record and other exhibits needed to resolve the matter; that initially, the parties would equally divide the costs; and that such costs would be taxable.

The court hereby approves the procedure suggested by the parties as a salutory means of conserving judicial resources. The matter of the amount of attorneys' fees to be awarded, then, is hereby referred to the previously agreed-upon panel of local attorneys—Messrs. Charles T. Boyd, Noah Jenerette, and James Cobb—with the request that they study such portions of the record herein as shall be submitted to them by counsel for the respective parties. The members of the panel are requested to file their report with the court within 20 days of the date hereof, stating their respective professional opinions as to what fee should be awarded counsel for the claimants. The members of the panel shall be compensated for their time expended in this effort upon a basis to be mutually agreed upon by counsel for the respective parties and the members of the panel, or failing such agreement, by the court.

Judgments in the amount of "$260,-268.28" in favor of Barbara E. Murphy as receiver for USAFORM Hail Pool, Inc.; $281,804.70 in favor of Barbara E. Murphy as receiver for U. S. and Foreign Management, Ltd.; and $28,400.00 in favor of USAFORM Pan American, Ltd.; together with interest at the rate of 6% per annum from August 30, 1963, and together with attorneys' fees as hereinafter to be determined, will be entered upon receipt of proof of costs and the recommendation of said panel with respect to fees.

ed, they become part of the judgment in the insured's favor. *Id.* at subsection (3); *see, e. g., Stevenson Insurance Associates, Inc. v. Cohen,* 228 So.2d 118, 120 (Fla.3d Dist.Ct.App.1969). Had this court's original judgment been affirmed in *USAFORM I,* F & D could argue that the disallowance of attorneys' fees was implicitly affirmed as well. In that posture, this case would be closely similar to *Gulf Coast Building*

*and Supply Co., Inc. v. International Brotherhood of Electrical Workers, Local No. 480,* 460 F.2d 105 (5th Cir. 1972), wherein the court found that in affirming a prior judgment of the district court it had impliedly affirmed a denial of prejudgment interest. *Id.* at 108. Here, F & D had no claim to such an "implicit affirmance", since as between the claimants and F & D there has never been an affirmance at all.